UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MONTE C. HOISINGTON,<br><br>  Plaintiff,<br><br>  v.<br><br>HENRY RICHARDS, *et al*.,<br><br>  Defendants. | Case No. C05-5281 RBL/KLS<br><br>REPORT AND RECOMMENDATION<br><br>**NOTED FOR:**<br>**OCTOBER 20, 2006** |

    This civil rights action has been referred to United States Magistrate Judge Karen L. Strombom pursuant to Title 28 U.S.C. § 636(b)(1)(B) and Local MJR 3 and 4. In this civil rights lawsuit, plaintiff alleges due process violations regarding personal property procedures at the Special Commitment Center (SCC). Specifically, Plaintiff alleges due process violations regarding the amounts and types of personal property he may possess while at the SCC, from which vendors he may make purchases, and the processes to which persons outside the SCC must adhere to when sending property to him at the SCC.

    Defendants are Henry Richards, Ph.D., SCC's Superintendent, Alan McLaughlin, SCC Associate Superintendent, and Rick Ramseth, SCC Facilities & Support Services Administrator. Defendants move for summary judgment (Dkt. # 22), arguing that Plaintiff cannot demonstrate a

REPORT AND RECOMMENDATION - 1

substantive due process right to possess the property he identifies, nor can he show that Defendants failed to provide procedural due process regarding property issues.  Defendants argue further that they are entitled to Eleventh Amendment sovereign immunity in their official capacities and qualified immunity in their personal capacities.

Reviewing the facts in the light most favorable to plaintiff, the court agrees that Defendants are entitled to summary judgment for the reasons stated below.

## I.  FACTS

The following background facts relating to SCC's mission, the SCC facility and SCC policies and processes relating to resident property, were provided by Defendants and are not disputed by Plaintiff.  As is later noted, Plaintiff takes issue with the rational of Defendants' policies, their refusal to address issues on an individual resident basis, and disputes whether certain processes given to him were sufficient.

### A.    The SCC's Mission

A "sexually violent predator" (SVP) as that term is defined in statute may be committed to Department of Social and Health Services' (DSHS) custody, pursuant to court order, for treatment in a secure facility. Wash. Rev. Code § 71.09.020(16). Such persons are detained at DSHS's SCC, a total confinement mental health facility for the treatment of SVPs, the only such mental health treatment facility in the state. (Dkt. # 39, ¶ 3).

### B.    The SCC Facility

The SCC began occupying its newly constructed, $60 million, state-of-the-art facility in May 2004, with the move of the first group of residents to the facility. (Dkt. #40, ¶ 2).  The remaining residents moved to the new facility by mid-June 2004. (Id.).  The current SCC facility has several living units with between 4 and 48 resident bedrooms each.  (Dkt. # 39, ¶ 3).  Other than Redwood, the bedrooms range in size from 88 to 128 square feet. Each resident bedroom is furnished with a bed (most with under bed storage), a 44" x 25" built-in desk, a 42" x 86" storage unit, and an 18" x 46" storage piece for a TV/VCR/stereo combination.  Decisions regarding the amount and types of property residents were allowed to bring from the former facility were based on the size and furnishings that existed in the new facility's resident bedrooms at the time of the move. (Id.).  Redwood did not exist at that time and did not open until approximately six months later. (Id.).

REPORT AND RECOMMENDATION - 2

**C.    Resident Property**

The SCC's management staff has developed policies setting requirements for inventory, control, allowances, restrictions and dispositions of resident property to ensure accountability and to maintain a safe, sanitary, and orderly environment. (Dkt. # 40, ¶ 4). Decisions regarding the amounts and types of personal property residents may possess are informed by the SCC management team members' professional judgment based on their collective experience in the safe operation of secure treatment facilities in general and the SCC in particular. Considerations include maintaining a therapeutic treatment environment, avoiding residents' use of cash or property for exploitation, minimizing the introduction of contraband into the facility, and reducing the risk of fire and vermin infestation. (Id. at ¶ 5). The SCC strives to maintain an appropriate balance between allowing residents to create a reasonably personalized atmosphere in their individual bedrooms and the need to maintain a safe and therapeutic communal living environment for sexually violent predators in furtherance of the SCC's mission. (Id).

A product of SCC management staff's exercise of professional judgment, Policy 231, *Resident Master Property*, was developed to provide a listing of the personal property residents may possess at the SCC, as well as a separate list of religious items. (Id., ¶ 4, Attach. B). Policy 212, *Resident Computers and Technical Devices*, governs what electronic and related items a resident may possess. (Id., Attach. C). The items included in the master property list change from time to time based on institutional needs, including the safe and secure operation of the SCC, and also based on resident requests. Considering security, safety, orderliness, bedroom space, and sanitation, it is unreasonable to expect that any individual resident may possess all allowable property. (Id., Attach. B at ¶ IV).

Residents who wish to possess something not included on one of the property lists may request that the item be added to the list or for an individual exception to policy to purchase that item. (Id. at ¶ V). A property review committee from the resident's program area reviews such requests at least monthly and recommends to the Program Area Manager whether the request should be approved or denied. (Id.). Absent an approval pursuant to this process, a resident may possess only those items included in the property lists in Policies 212 and 231. (Id. at ¶ IV).

**D.    Approved Vendors**

SCC residents may make purchases from approved vendors by following SCC procedures for doing so. (Id., Attach. E, Policy 202, *Resident Postage, Packages and Mail;* Attach. B., Policy 231, *Resident Master Property*). Residents may request that a vendor be added to the approved vendor list. Upon receipt of such a request, SCC staff screen the proposed vendor to determine if the vendor is a legitimate business, is not owned or significantly controlled by a resident or former resident, accepts payment in a way that works with SCC business practices, offers products that fit the treatment and security mission of the SCC, and follows specific business service practices. (Id., Attach. B, ¶ VIII). A vendor that does not continue to do business in compliance with SCC expectations may be removed as an approved vendor at any time. (Id.). SCC staff verifies that proposed vendors meet SCC qualifications before approving such vendors. (Id., ¶ 6).

Generally, approving multiple vendors that offer the same products increases the use of staff resources on a continuing basis. (Id.). For example, at one time, the

REPORT AND RECOMMENDATION - 3

SCC had several approved vendors that sold nutritional supplements. For each vendor, SCC medical staff had to review the changing product offerings on an ongoing basis to determine whether, in the exercise of their professional judgment, any was inappropriate for the SCC's population. If so, staff would have to note in each vendor catalogue what products residents may purchase. Examples of products that SCC professionals have concluded are inappropriate or medically contraindicated for the SCC's population include steroids, sexual performance enhancing products, and certain muscle-building products. (Id.) Therefore, for the sake of the efficient management of the SCC's mail services, to conserve program resources devoted to verifying vendor qualifications, to avoid the introduction of contraband into the SCC, and to ensure the safety and security of the SCC residents and staff, the SCC generally does not approve vendors that offer products already available from other approved vendors. (Id.).

E. **Friends and Family Members May Send a Resident an Item if it is Included In the Property Lists**

A resident's friend or family member (collectively "family") may also send clothing or personal photo media (e.g. family pictures) directly to a resident without going through an authorized vendor. (Id., Attach. B at ¶ VIII). Family may also order an item for a resident from an approved vendor to be shipped directly to a resident at SCC. (Id., Attach. B at ¶ VIII; Attach. C). The purpose of this policy is to maintain a streamlined process for handling the receipt and delivery of resident packages to the residents and to avoid the introduction of contraband into the SCC. (Id., ¶ 13).

F. **Electric Coffee Pots**

Electric coffee pots have never been on the SCC's master property list. (Id., ¶ 4). In the past, however, when the SCC was in its former facility within the perimeter of the McNeil Island Corrections Center (MICC), some SCC staff (not defendants) approved some residents to purchase and possess electric coffee pots. (Id.). In preparation for the May 2004 move to the new facility, SCC management determined that electric coffee pots pose an unacceptable threat to the safety and security of the SCC residents and staff, including the risk of causing a fire, and potentially overloading the electrical circuits within the facility. As a result, SCC management notified residents that electric coffee pots would not be allowed at the new facility. (Id.). Residents were given the opportunity to send their electric coffee pots out of the facility to a friend, family member, or other recipient of their choice at the SCC's expense. Further, the SCC offered to exchange residents' electric coffee pots for a non-electric coffee maker at no cost to residents. The SCC also arranged to have microwave ovens and "hot spots" (instant hot water dispensers) on each living unit for residents to use to make hot beverages. If a resident did not make an election by a date certain, he was required to send his electric coffee pot out of the SCC at his own expense. He was not allowed to possess his coffee pot at the new facility. (Id.). Plaintiff elected not to send out his coffee pot, and it was removed as unauthorized upon the move to the new facility. (Id., Attach. D at ¶ IX).

G. **Computer Desks**

Some residents, including plaintiff, possessed a personal computer desk at the old facility. Amended Complaint (Dkt. # 15, ¶ 6.2). Resident bedrooms at the current facility have built-in desks. (Dkt. # 40, ¶ 3). The rooms ready for occupancy

REPORT AND RECOMMENDATION - 4

at the time of the May 2004[1] move are not large enough to accommodate both the built-in desk and a second desk, without overcrowding the room and creating a safety hazard. (Id.). Thus, residents were informed before the move that they must send their personal desks out of the facility. The SCC offered to pay the cost of shipping for those residents who elected to send out their desks (and other non-conforming property) by a deadline. Residents were invited to request an exception to the policy by submitting a request to a property committee. (Id.). Residents were informed that if they failed to send out non-conforming property by the deadline, they would not be able to take the property to the new facility and that they would be required to pay for the cost of shipping the item out of the institution. If the resident did not ship out the property before the move to the new facility, the non-conforming property was removed and placed in a warehouse awaiting instructions from the resident. (Id). Eventually, that property was disposed of when it became clear that the resident had no intention of sending out the item, despite being told he would not be allowed to keep the item in his bedroom. (Dkt. # 40, Attach. C.).

Plaintiff failed to direct the SCC to send out his computer desk to the person of his choice before the deadline to do so at the SCC's expense. (Id. at ¶ 3) Plaintiff also failed to send out the desk himself before the move to the new facility. (Id.). Upon his move to the new facility, plaintiff's desk was sent to a warehouse for storage. (Id.). Plaintiff did not request an exception to keep his desk, nor did he instruct the SCC to send out the desk. (Id.).

H.      **SCC's Level System**

SCC has a privilege level system designed to give residents opportunities and privileges commensurate with pro-social behavior and to reward participation in treatment. (Id., ¶ 15). The level system includes increasing the amount of personal funds a resident may spend for personal items as a resident's level increases. The Courts repeatedly have found SCC's level system to be an appropriate exercise of professional judgment to reward residents' good behavior, including in a case in which Mr. Hoisington was the plaintiff. *See, e.g.,* Order (*Hoisington v. Seling*, No. C01-5228RBL, Dkt # 189).

## II. DISCUSSION

A.      **Standard of Review**

Pursuant to Fed. R. Civ. P. 56 (c), the court may grant summary judgment "if the pleadings,

---

[1]The bedrooms on SCC living units Redwood East and West, which did not open until October 2004, are larger than those on other living units. Bedrooms on Redwood are 10' 5" x 10' 4.75". The built-in desks on Redwood are 76" x 19.75". The remaining furnishings are the same as the bedrooms on the higher maintenance/structure units. However, Redwood did not open until October 18, 2004, and that date was unknown at the time the current SCC facility opened. Further, which residents ultimately would qualify for the privilege of living on Redwood, the lowest maintenance living unit, was unknown before the SCC population moved to its current facility. (Dkt. # 40, ¶ 3). Plaintiff qualified to move to Redwood on May 2, 2005. (Id.).

REPORT AND RECOMMENDATION - 5

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T. W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial, e.g. the preponderance of the evidence in most civil cases. Anderson, 477 U.S. at 254; T.W. Elec. Service Inc., 809 F.2d at 630. The court must resolve any factual dispute or controversy in favor of the nonmoving party only when the facts specifically attested by the party contradicts facts specifically attested by the moving party. Id.

The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in hopes that evidence can be developed at trial to support the claim. T.W. Elec. Service Inc., 809 F.2d at 630 (relying on Anderson, *supra*). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990).

**B.     Analysis**

REPORT AND RECOMMENDATION - 6

      **(1)    Claims Against Defendants in Their Official Capacities**

Plaintiff has sued both defendants in their individual and official capacities. Absent a waiver of sovereign immunity, neither states nor state officials in their official capacities are subject to suit in federal court under 42 U.S.C. § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). The limited exception found in Ex parte Young, 209 U.S. 123 (1908), allowing the enjoining of state officials from a continuing violation of federal law, does not exist here. Therefore, all claims against defendants in their official capacities must be dismissed.

      **(2)    Violation of Plaintiff's Rights of Due Process - To Purchase/Retain Property From Vendors of Choice and From Family Members**

The Due Process clause protects persons from deprivations of life, liberty, or property without due process of law. The two types of due process are substantive and procedural. DeKalb Stone, Inc. v. County of DeKalb, Ga., 106 F.3d 956, 959 (11th Cir. 1997), *reh'g and suggestion for reh'g en banc denied*, 116 F.3d 494 (11th Cir. 1997) and *cert. denied*, 522 U.S. 861 (1997). Substantive due process applies to violations of fundamental rights, i.e., a right created by the Constitution itself, or protected interests to determine whether a governmental official acted arbitrarily and capriciously, regardless of the procedures used to facilitate that deprivation. County of Sacramento v. Lewis, 523 U.S. 833, 845-47 (1998). Procedural due process ensures a fair decision making process when the government acts to deprive a person of a protected interest. Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

The first step in a due process analysis is to analyze the nature of the right allegedly infringed. Watson v. University of Utah Medical Center, 75 F.3d 569, 577 (10th Cir. 1996); DeKalb, 106 F.3d at 959. Here, the question is whether the complained of deprivations infringe on a significant property interest and/or whether the deprivations rise to the level of a constitutional significance. DeKalb, 106 F.3d at 959; Parratt v. Taylor, 451 U.S. 527 at 532 (1981).

Referring to Plaintiff's Amended Complaint, Defendants summarize Plaintiff's claims as

REPORT AND RECOMMENDATION - 7

follows: Plaintiff claims that substantive due process requires Defendants to allow him to purchase all property he wishes and from any vendor he wishes; that his family members must be allowed to send packages directly to him even if they contain items other than clothing or personal photo media; that his family members must be allowed to send other items to him via the vendors of their choice; that he must be allowed to have an electric coffee pot in his bedroom at the SCC; and that he must be allowed a personal computer desk in his bedroom at the SCC without regard to SCC concerns regarding safety and security. (Dkt. # 15, ¶¶ Amended Complaint (Dkt. # 15) ¶¶ 6.9, 6.13, 6.15, 6.17, 6.22, 6.24).

Plaintiff argues that Defendants are trying to misrepresent his Complaint. (Dkt. # 41, p. 4). Plaintiff states that his claims are for "taking property and privileges that [were] previously approved by the Defendants and in Plaintiffs possession for years." (Id.). Further, Plaintiff argues that any item that has been in his possession for years "without a safety issue cannot now become a safety concern." (Id. at p. 5). Plaintiff also argues that Defendants fail to address issues on an individual basis. For example, while there are a few residents that have too many items in their cells or abuse the right of owning property, he has had numerous safety inspections for safety and cleanliness and has passed them all and has possessed a computer for years and has never had any type of contraband on it. (Id. at p. 6-7).

Defendants argue that Plaintiff can show no protected right, nor a state created right, for persons detained in a facility such as the SCC to purchase specific property from the vendors of their choice, nor to receive packages from family directly, rather than via an approved vendor. The inability to buy or receive property from an approved person or vendor, rather than any vendor of his choosing, does not rise to the level of constitutional significance. Thus no constitutional violation has occurred. Furthermore, even if the amount of property he could purchase and vendor choice were a protected right, substantive due process requires that the act of the government be arbitrary to the extent that it shocks the conscience before a constitutional violation will be found. *See* Lewis, 523 U.S. at 845-47; United Artists Theatre Circuit, Inc. v. Township of Warrington, PA, 316 F.3d 392, 399 (3rd Cir. 2003).

REPORT AND RECOMMENDATION - 8

SCC provides the following evidence to support its policies and procedures limiting the purchase and receipt of property by its residents:

> SCC staff must maintain the safety and security of the institution. (Dkt. # 38, ¶ 5). Enumerating what items can be purchased and from whom helps to ensure that safety and security. (Id., ¶ 8). The SCC must review the items each authorized vendor offers for sale to determine whether any is counter-therapeutic. (Id., ¶ 6). The process of doing so requires significant staff resources, and thus the SCC attempts to minimize the number of vendors who offer similar items. Regarding nutritional supplements, for example, SCC medical staff must review each product to determine if each is appropriate for resident use. Products claiming to enhance sexual performance, e.g., are inappropriate in the SCC's treatment environment. (Id.). To maintain a safe and clean environment, including avoiding vermin infestations or illness from spoiled food, residents may keep only a certain amount of perishable food products in their rooms. SCC management has determined a limited amount of perishables is preferable to none at all. (Dkt. # 39, ¶ 6).
>
> Resident computers present a continuing security and therapeutic threat to the SCC program. The SCC has experienced problems with residents creating near replicas of SCC policies and attempting to pass them off as genuine. In fact, plaintiff presented to defendant Dr. Richards, during his deposition, Exhibits 1 and 11, which are near replicas of SCC policies, and asked Dr. Richards to confirm their authenticity. (Dkt. # 39, Attach. A, pp. 7, 8, 49, Ex. 1, 11). It was immediately apparent to Dr. Richards that these documents were not genuine because they did not contain the handwritten signature of the person who approved the policies, but had the approving authority's name printed in a cursive font. True and correct copies of SCC policies 201 and 236, signed by then-SCC Superintendent Dr. Mark Seling are attached to the Declaration of Henry Richards, Ph.D., as Attachments B and C.
>
> The SCC has also discovered counter therapeutic pornography on residents' computers. (Dkt. # 39, ¶ 5). Thus it is important for the SCC to identify appropriate equipment and to monitor residents' purchases of such items. Therefore, on November 10, 2005, Dr. Richards authored a memorandum notifying all residents that he had implemented a moratorium on resident purchases of computer equipment. (Id., Attach. A Ex. 7). The reason for the moratorium was that the SCC's leadership team had begun a process of evaluating what computer and electronic devices would be appropriate for residents to possess at the SCC. The SCC wished to avoid a resident purchasing an electronic item during the evaluation process, only to be required to send it out of the institution if that item would no longer to be allowed following the review.
>
> The SCC has experienced persons outside the facility attempting to send contraband to residents. (Dkt. # 39, ¶ 13). To limit the introduction of contraband, SCC management staff, in the exercise of their professional judgment, have authorized residents to receive clothing and personal photo media (e.g., family photos) directly from friends and family. Persons wishing to send other items on the Resident Master Property List to residents may do so via an approved vendor. *Id.*
>
> Residents may request exceptions to the property policies. (Dkt. # 39, ¶ 7). Dr. Richards considers exceptions based on the requesting resident's individual situation in deciding whether to make an exception. (Id.).

REPORT AND RECOMMENDATION - 9

1    Plaintiff counters that he has had numerous safety inspections of his cell for safety and
2 cleanliness and has passed them all. (Dkt. # 41, p. 6).  The exhibit used during Dr. Richard's
3 deposition was received from another resident from his attorney through the mail and has been on
4 residents' computers for years. (Id.).  Plaintiff argues that he has a right to have legal documents on
5 his computer for legal purposes and access to the Courts.  (Id.).  Plaintiff points to the fact that he
6 has possessed his computer for years and has never had any type of any contraband on it.  (Id.).
7 Plaintiff complains that he has never been given a fair hearing to determine whether possession of
8 these items are a safety problem.  (Id.).   Plaintiff also complains of several other items that he has
9 had in his possession for years without problem but which have now been taken or limited by SCC
10 policy: vitamins at a lesser cost, four reams of copy paper have now been limited to two, limiting his
11 access to courts; an ink refill kit previously approved was taken away and then approved again, but
12 he now has to go to the hobby shop at certain times to refill.  Plaintiff also questions Defendants'
13 rational in placing limitations on soda pop as a perishable item and limiting his purchases to six cans
14 as opposed to 48 cans as he was formerly allowed when he first arrived at SCC.

15    Plaintiff states that when he first arrived at SCC he was allowed to receive any approved
16 property from his family.  (Dkt. # 41, p. 19) (emphasis added).  Plaintiff states that SCC's change in
17 limiting family member packages to clothing and photo media to avoid the introduction of
18 contraband into the SCC is unfair as there is no evidence that he or his family members ever tried to
19 struggle contraband into SCC.  (Id.).   In addition, Plaintiff argues that SCC's rational in changing
20 the policy makes little sense because the manner in which packages are received and processed by
21 SCC staff members prior to being given to a resident, were the same whether the packages were sent
22 by a family member or a vendor.

23    Moreover, Plaintiff argues, that Defendants' reference to applying for an "exception" to a
24 policy "looks good on paper, and is a good argument for this Court, but all the Defendants have to
25 say is no to that exception without a hearing to prove the item is a safety issue. Defendants exhibit
26 no evidence of ever granting an exception." (Dkt. # 41, p. 11-12).  The record does not reflect that
27 Plaintiff ever asked for an exception, however, and presents this court with no evidence that the

REPORT AND RECOMMENDATION - 10

exception process would be futile in the event safety (or for that matter, security or cleanliness) were not at issue.

Viewing all evidence in the light most favorable to the Plaintiff, the court finds that Plaintiff's numerous complaints as to the amounts and types of personal property he may possess, from which vendors he may make purchases, the types of packages family members may send to him – do not rise to the level of constitutional significance. Even if the amount of property he could possess and purchase and the choice of vendors were a protected right, substantive due process requires that the act of the government be arbitrary to the extent that it shocks the conscience before a constitutional violation will be found. *See* Lewis, 523 U.S. at 845-47; United Artists Theatre Circuit, Inc. v. Township v. Warrington, PA, 316 F.3d 392, 399 (3d Cir. 2003). The court does not find one here as the undisputed evidence in this case illustrates that the SCC's actions in enumerating what items residents may purchase and receive are necessary to maintain the safety and security of the institution.

Due process does not require the SCC to provide each resident with an individualized set of policies and procedures nor does it require the SCC to except a resident from policies and procedures integral to the safe, secure and efficient operation of the facility. However, due process does require the SCC to provide notice and an opportunity to be heard. With regard to the handling of Plaintiff's desk and coffee pot, the evidence reflects that Plaintiff had both notice and an opportunity to be heard and in addition, had an opportunity to send the property to a person of his choosing at SCC's expense, but chose not to do so.

### (3) **Violation of Plaintiff's Rights of Due Process - Coffee Pot/Desk**
**Plaintiff Received Notice and an Opportunity to be Heard Regarding His Electric Coffee Pot and Personal Desk**

Once it has been determined that a protected interest exists, the next inquiry in a procedural due process analysis is whether the person was afforded appropriate process before the deprivation occurred. Watson, 75 F.3d at 577. Minimal procedural due process requires that parties whose

REPORT AND RECOMMENDATION - 11

rights are affected are entitled to be heard and, so that they may exercise that right, they must be notified. Fuentes, 407 U.S. at 79.

Plaintiff alleges he did not receive procedural due process before his electric coffee pot and personal computer desk were removed upon the SCC's move to its current facility. (Dkt. # 15, ¶ 5.7). Plaintiff also argues that he did not have fair notice that the property would be disposed of, and that the desk should have been stored until it was determined whether it would have fit into a Redwood unit room. (Dkt. #41, p. 14-15). As to his coffee pot, Plaintiff also argues that the Defendants posited safety concerns for disallowing his coffee pot has no merit because he has exhibited no behavioral problems, the coffee maker has an automatic shut-off feature, and, the resident care manager stated to the Ombudsman that he personally had no problem with this type of coffee pot. (Id., p. 16-17).

Defendants submit that SCC management staff determined that certain items that residents may have possessed at the former facility would not be authorized at the new facility. (Dkt. # 38, ¶ 3, Attach. A). Those items included electric coffee pots and personal computer desks. Electric coffee pots have never been included as authorized in the SCC's property policy, Policy 231, *Resident Master Property*. (Id., Attach. B). In the past, however, some SCC staff members had allowed some residents to have electric coffee pots in their rooms at the former facility. (Id., ¶ 4). In preparation for the move, SCC management staff determined that electric coffee pots posed a potential safety hazard and determined not to allow residents to have them in their bedrooms at the new facility, listing concerns such as overloads of the new facility's electrical system, the risk of fire if such devices were left unattended, and the risk of using hot liquids as a weapon. (Id.). The new facility is equipped, however, with built-in instant hot water dispensers in the day rooms of the living units, as well as microwave ovens to make warm drinks. The SCC notified residents that electronic coffee pots would not be allowed at the new facility and offered to pay for shipping for those residents who sent out their electric coffee pots by a certain date, otherwise the residents would have to pay the shipping themselves. (Id., Attach. D). SCC also offered to exchange residents' electronic coffee pots for non-electric coffee filters at no charge to residents. SCC also implemented a policy

REPORT AND RECOMMENDATION - 12

by which residents could request an exception before the move to the property policy. (Id., Attach. A).

Plaintiff did not follow the procedure to request an exception to the property policy before the move to the new facility, nor did he take advantage of the SCC's normal grievance policy to be heard on the matter. (Id., ¶ 4).

Defendants argue that the existence of the option to send the desk and coffee maker to plaintiff's family member or other person of plaintiff's choosing at SCC expense is fatal to any due process claim Plaintiff may assert, and cite to Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991). The court agrees. Plaintiff could not have been deprived of his property in violation of due process because he was given the opportunity to send his property to a person of his choice at no cost to himself and he chose not to do so. Minimum due process requires notice and an opportunity to be heard. The undisputed facts in this case reflect that Plaintiff had both. SCC gave Plaintiff notice in November 2003, seven months before the move to the new facility, that his desk would likely not be allowed there because the bedrooms had built-in desks (Dkt. # 38, § 3); that his desk would be sent out at his direction or lacking his direction, be donated or be otherwise disposed of. (Id.). Plaintiff was advised he could request an exception. (Id., Attach. A). Plaintiff could have filed a grievance when he first learned that his desk would not be allowed but instead, he waited until after his desk was taken to file a grievance. (Id., Attach. B). Plaintiff's submission of his in-house inventory as evidence that his desk was an approved inventory item unfortunately does not assist his argument that he was authorized to keep the desk following the move to the new facility, particularly as the inventory was not made the subject of his grievance, (Dkt. # 38, Attach. B), despite Plaintiff having been given notice several months prior that, any property not on the "master property list," would have to be sent out of the institution at SCC expense. (Id.).

Similarly, the evidence reflects Plaintiff was offered a non-electric coffee maker at no expense to him to be used in conjunction with the "hot spots" at the new facility, that the SCC offered to send his coffee maker to a family member at no expense to him, and that he failed to take advantage of this offer or to file a grievance over the issue. (Dkt. # 39, § F, Attach. F). Plaintiff appears to take

REPORT AND RECOMMENDATION - 13

issue with SCC's reasons for disallowing the coffee pots, however, Plaintiff has not provided the court with evidence to show that SCC's decision was so arbitrary that it "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 845-47 (1998). The court is satisfied that it is within the professional judgment and province of SCC to err on the side of caution in deciding to disallow electric coffee makers in resident bedrooms for fear that electric coffee pots pose an unacceptable threat to the safety and security of the SCC residents and staff, including the risk of causing a fire, and potentially overloading the electrical circuits within the facility.

### (4) Lacking Evidence of a Constitutional Violation, Plaintiff's Claims For Injunctive Relief Fail

The power of federal courts to grant injunctive relief is limited to situations involving constitutional violations. *E.g.,* Hoptowit v. Ray, 682 F.2d 1237, 1245 (9th Cir. 1982). Because Plaintiff is unable to demonstrate that Defendants have violated his constitutional rights, his claims for injunctive and declaratory relief fail as a matter of law.

### (5) Qualified Immunity of Federal Officials

Defendants urge that they are, in any event, entitled to qualified immunity. As the court has determined that Plaintiff has failed to allege a deprivation of an actual constitutional right, the issue of qualified immunity need not be reached. *See* Conn v. Gabbert, 526 U.S. 286, 290 (1999).

### III. CONCLUSION

For the reasons stated above the court should **GRANT** defendants' motion for summary judgment and dismiss plaintiff's claims with prejudice. A proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of

REPORT AND RECOMMENDATION - 14

1  appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule

2  72(b), the clerk is directed to set the matter for consideration on **October 20, 2006**, as noted in the

3  caption.

5      DATED this 15th day of September, 2006.

                                                 Karen L. Strombom
                                                 United States Magistrate Judge

28  REPORT AND RECOMMENDATION - 15